UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

LEON E. PHELPS, JR.,                                    **MEMORANDUM AND**
                                                        **OPINION**
                            Plaintiff,                  04-CV-773 (JMA)

            -against-

P.O. RICHARD A. SZUBINSKI and THE CITY OF
NEW YORK,

                            Defendants.

--------------------------------------------------------------------X

A P P E A R A N C E S:

Alan D. Levine, Esq.
80-02 Kew Gardens Road, Suite 1010
Kew Gardens, New York 11415
*Attorney for Plaintiff*

Michael A. Cardozo
Corporation Counsel of the City of New York
100 Church Street
New York, New York 10007
            *By:    Susan P. Scharfstein*
                    *Assistant Corporation Counsel*


**AZRACK, United States Magistrate Judge:**

        Plaintiff, Leon E. Phelps, Jr. ("Phelps" or "plaintiff"), commenced this action pursuant to

42 U.S.C. § 1983 on February 25, 2004, against Police Officer Richard A. Szubinski

("Szubinski"), alleging false arrest and excessive force arising out of an incident that occurred on

November 6, 2003, as well as state law claims for false arrest, battery and negligence, and

derivative state law claims against the City of New York (the "City").  (Complaint ¶¶ 2, 4.)

Presently before the Court is defendants' motion for summary judgment on all claims.  For the

reasons stated herein, I decline to exercise jurisdiction over plaintiff's state law claims and grant defendants' motion for summary judgment as to plaintiff's false arrest and excessive force claims.

# I.  BACKGROUND

The facts described below are taken from the parties' depositions, declarations, affidavits, exhibits and respective Local Rule 56.1 statements of facts, and are construed in the light most favorable to plaintiff, the non-moving party, with all factual ambiguities resolved and all reasonable inferences drawn in his favor.  See Capobianco v. City of New York, 422 F.3d 47, 50 n.1 (2d Cir. 2005) (citation omitted).

## A.  The Arrest

On November 6, 2003, at approximately 6:00 P.M., plaintiff was operating a motor vehicle in the southbound lane of Crossbay Boulevard in Queens County, New York. (Complaint ¶ 16.)  Defendant Szubinski, who was on patrol in a marked radio motor patrol vehicle ("RMP"), determined that plaintiff was speeding through the use of a radar gun and directed plaintiff to pull over to the side of the road.  (Complaint ¶ 17; see also Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. 1-2 ("Pl.'s Mem."); Tr. of Pl.'s N.Y. Gen. Mun. Law § 50-h Hr'g 15:15-24, Jan. 29, 2004 ("Pl.'s 50-h Hr'g").)  Officer Szubinski advised plaintiff that he had been stopped for speeding (Pl.'s Rule 56.1 Statement ¶ 5; Pl.'s Dep. 101:15-16, 105:21-106:3, Dec. 26, 2006 ("Pl.'s Dep."); Pl.'s 50-h Hr'g 15:22-24), and asked for plaintiff's driver's license and registration (Complaint ¶ 19; Pl.'s 50-h Hr'g 16:23-17:4).  Officer Szubinski took plaintiff's documents to the RMP, where he performed a computer check of records maintained

by the Department of Motor Vehicles ("DMV"). (Complaint ¶ 21; Pl.'s Mem. 2.) Officer Szubinski subsequently advised plaintiff that his driver's license had been revoked and placed him under arrest, handcuffing plaintiff behind his back. (Complaint ¶¶ 22-24; Pl.'s Rule 56.1 Statement ¶ 10; Pl.'s Mem. 2; Pl.'s Dep. 109:13, 110:3-11; Pl.'s 50-h Hr'g 18:3-4, 19:7-20:9.)

Plaintiff states that he does not recall how fast he was going when he was stopped by defendant Szubinski (Pl.'s Dep. 101:17-19; Pl.'s 50-h Hr'g 16:14-16) or the speed limit in the area in which he was stopped (Pl.'s Dep. 106:4-16; Pl.'s 50-h Hr'g 16:17-19). Plaintiff also states that the vehicle he was driving was registered to his fiancée, Katrine Ferreri, and that the motor vehicle insurance was in her name, but he had her permission to use the vehicle. (Pl.'s Dep. 102:7-14; Pl.'s 50-h Hr'g 16:4-13.)

As Officer Szubinski escorted plaintiff to the RMP, plaintiff informed him that he had an artificial hip and asked him to use caution when placing him inside the RMP. (Complaint ¶¶ 26-27; Pl.'s Rule 56.1 Statement ¶ 11; Pl.'s Mem. 2.) Officer Szubinski opened the rear passenger-side door of the RMP and pushed plaintiff onto the seat. (A. Levine Decl. Ex. B ¶ 2 ("Phelps Aff."), Jan. 28, 2008 ("Levine Decl.").) Plaintiff's right buttock landed on top of the seatbelt receptacle, and plaintiff immediately felt pain in his right hip. (Phelps Aff. ¶ 2; Pl.'s 50-h Hr'g 22:15-23.) Officer Szubinski took hold of plaintiff's right leg to place it in the RMP, hyperextending the leg and causing plaintiff "excruciating" pain. (Phelps Aff. ¶ 2.) Officer Szubinski then shut the door, causing the inside door handle to strike plaintiff's right leg. (Pl.'s Mem. 3; Pl.'s Dep. 127:6-23.)

Officer Szubinski transported plaintiff to the 100th Precinct Stationhouse. (Pl.'s Mem. 3.) Plaintiff observed swelling around his right knee and had difficulty walking. (Id.) He telephoned his fiancée, Katrine Ferreri, who brought plaintiff's pain medications, knee brace,

and crutches to the precinct, though she was not permitted to give these items to plaintiff. (Pl.'s Mem. 3; Pl.'s Dep. 150:9-22.) Plaintiff initially declined medical attention, but eventually requested that he be taken to the hospital. (Pl.'s Mem. 3-4.) An ambulance arrived at the precinct, and emergency medical technicians transported plaintiff to Peninsula Hospital Center, where x-rays indicated loose screws in plaintiff's artificial right hip. (Pl.'s Mem. 4.)

Plaintiff was discharged from the hospital and issued a Desk Appearance Ticket, charging him with aggravated unlicensed operation of a motor vehicle in violation of section 511(1)(a) of the New York Vehicle and Traffic Law. (Pl.'s Mem. 4.) When plaintiff appeared in Queens County court on the return date for the Desk Appearance Ticket, December 29, 2003, he was informed that the charges against him had been dismissed. (Id.)

**B.     Plaintiff's Medical History Prior to the November 2003 Incident**

Plaintiff initially injured his right hip in 1991, while in the Air Force during the first Gulf War, when an explosion threw a forklift against him. (Pl.'s Dep. 70:4-10, 70:20-71:10, 74:3-5.) As a result, in 1991, he had a hip replacement performed on his right hip and some shrapnel removed from his back. (Pl.'s Dep. 74:19-75:9, 176:9-13.) Plaintiff had one revision done to his right hip replacement in 1993 (Pl.'s Dep. 176:14-20), and another in 1997 (Pl.'s Dep. 176:2-8, 177:18-178:5).

Plaintiff's right knee was injured when he was hit by an automobile in 1997. (Pl.'s Dep. 77:4-8, 77:12, 77:21-23, 81:10-23, 152:12-17.) That same year, plaintiff also injured his right knee while playing basketball. (Pl.'s Dep. 86:2-10.) Plaintiff had arthroscopic surgery performed on his right knee in 1997. (Pl.'s Dep. 179:18-180:4.)

Plaintiff began seeing Dr. Alan Leff, a pain management specialist,[1] on July 31, 2000 (Levine Decl. Ex. N, Sept. 5, 2006 ("Leff Report") & Ex. M ("Leff Medical Records")), for a "sore lower back" and "sore hip" (Pl.'s Dep. 96:12-15). Dr. Leff noted that plaintiff complained of back pain and pain in the right hip area but could walk "okay" prior to the November 2003 incident. (Leff Dep. 134:2-5.) Dr. Leff stated that plaintiff had also experienced some right knee pain.[2] (Leff Dep. 204:9-16.) Additionally, plaintiff testified that his right knee had been swollen on approximately four separate occasions since his arthroscopic surgery in 1997 and prior to the November 2003 incident, but that he had not sought medical treatment. (Pl.'s Dep. 152:4-153:22.) From July 31, 2000, to October 9, 2003, plaintiff's last visit to Dr. Leff prior to the November 6, 2003, incident, Dr. Leff stated that plaintiff's pain was managed with lumbar epidural cortisone injections, topical 5% Lidoderm patches, and oral pain medications, including MS Contin, one 100 milligram tablet every eight hours, and Percocet 10/650, one tablet every four hours for "breakthrough pain."[3] (Leff Report 1-2.)

---

[1] Dr. Leff defined a pain management specialist as a physician whose practice "concerns the treatment of patients who have acute or chronic pain problems" (A. Leff Dep. 79:5-8, Oct. 30, 2006 ("Leff Dep.")), and stated that pain management is a Board subcertification of anesthesiology (Leff Dep. 79:9-14).

[2] Although Dr. Leff testified at his October 2006 deposition that plaintiff experienced some knee pain prior to the November 2003 incident (Leff Dep. 204:9-16), and noted right knee pain during plaintiff's July 9, 2003, office visit (Levine Decl. Ex. M), he stated in his September 5, 2006, report that "prior to 11/3/2003 [plaintiff] had no complaints of knee pain" (Leff Report 1).

[3] According to the Physicians' Desk Reference, MS Contin, the brand name for morphine sulfate, is a controlled-release tablet used to relieve moderate to severe pain, and Percocet is a narcotic analgesic for treatment of moderate to moderately severe pain. See Physicians' Desktop Reference, http://www.pdrhealth.com/drugs/rx/ (last visited Sept. 12, 2003).

**C.** **Plaintiff's Medical Treatment Following the November 2003 Incident**

    **1.** **Peninsula Hospital Center**

Emergency medical technicians transported plaintiff from the 100th Precinct Stationhouse to Peninsula Hospital Center on November 6, 2003, at approximately 9:30 P.M.. (Pl.'s Mem. 4; see also Levine Decl. Ex. O.)  The Ambulance Call Report ("ACR") noted that plaintiff's chief complaint was "[m]y hip hurts."  (Levine Decl. Ex. O.)  The ACR also indicates that plaintiff described an acute, throbbing pain in his right hip that radiated down his right leg. (Id.)  "[Rule out] Artificial Hip Complications" is noted under the "Presumptive Diagnosis" section of the ACR.  (Id.)  The following is also noted on the ACR:  "P.t. did reveal swelling to [patient's right] knee and ankle.  [Patient] further [states] he normally cannot feel his [right] hip."  (Id.)

The Peninsula Hospital emergency room ("ER") triage report is dated November 6, 2003, at 10:35 P.M. and indicates that plaintiff complained of "[right] hip pain and [right] knee pain." (Levine Decl. Ex. O.)  X-rays of plaintiff's right hip, right knee, pelvis and right femur were ordered.  (Id.)  The radiologist's report indicates the following with respect to plaintiff's right knee:  "Radiograph of the right knee shows degenerative changes.  No fracture is seen."  (Id.) The radiologist's report indicates the following with respect to plaintiff's pelvis, right hip and right femur:  "Radiograph of the pelvis, right hip and right femur shows a right hip Bipolar prosthesis in good alignment with no fractures or subluxation.  No osteomyelitis seen."  (Id.)

The orthopedics consultation was performed by Dr. Horvath on November 7, 2003, at 1:27 A.M..  The reason for the consultation is recorded as "[right] groin pain."  (Id.)  Based on the x-rays and plaintiff's physical exam, Dr. Horvath opined that two screws in plaintiff's hip replacement appeared loose.  (Id.)  Dr. Horvath noted tenderness in plaintiff's knee, and

prescribed a knee immobilizer, crutches, a walker and Vicodin, as well as an ambulance to get plaintiff home.  (Id.)  Dr. Horvath noted the following with respect to plaintiff's right hip pain: "right total hip arthoplasty with possible loosening of acetabular component".  (Id.)  Dr. Horvath directed plaintiff to follow-up with him later on that same morning regarding the "[n]eed for revision".  (Id.)  The final diagnosis is indicated as "[Rule out right] hip prosthesis displacement."  (Id.)

### 2.   Dr. Alan Leff

Following the incident on November 6, 2003, plaintiff went to Dr. Leff's office for a November 10, 2003, appointment.  (Leff Dep. 131:19.)[4]  Plaintiff could not recall if he consulted another physician before going to Dr. Leff's office.  (Pl.'s Dep. 167:24-168:12.)  Dr. Leff testified that, following the November 2003 incident, the nature of plaintiff's hip pain changed such that he needed crutches to walk and was unable to put any weight on his right foot.  (Leff Dep. 147:20-148:5.)  Dr. Leff noted that he did not inquire of plaintiff as to where or when he got the crutches, or whether their use was recommended by another physician.  (Leff Dep. 149:4-150:4.)  Dr. Leff stated that he did not review any of the Peninsula Hospital Center records from the evening of the incident (Leff Dep. 201:10-11, 237:17-21), and that he did not take x-rays of plaintiff's hip or any other part of his body following the incident (Leff Dep. 139:22-140:7).

Dr. Leff first referred plaintiff to Dr. Allan Inglis and Dr. Elton Strauss, both orthopedic surgeons, for an evaluation of his hip pain.  (Leff Dep. 128:15-20.)  Dr. Leff admitted that he

---

[4] Although Dr. Leff testified at his October 2006 deposition that plaintiff's office visit was on November 10, 2003, in accordance with his office records (Levine Decl. Ex. M), he stated in his September 5, 2006, report that plaintiff's appointment was on November 9, 2003 (Leff Report 2).  The Court also notes that the incident date is incorrectly listed as November 3, 2003, throughout Dr. Leff's September 2006 report (Leff Report 2), while correctly listed as November 6, 2003, in his office records (Levine Decl. Ex. M).

neither received reports regarding the physicians' evaluations of plaintiff's hip, nor followed up with either orthopedist regarding their evaluations. (Leff Dep. 138:7-21.) Instead, Dr. Leff testified that his only source of information regarding these orthopedists' assessments of plaintiff's hip pain came from plaintiff himself. (Leff Dep. 138:22-139:11.)

Dr. Leff subsequently referred plaintiff to Dr. Mathias Bostrom of the Hospital for Special Surgery, who determined that two screws in plaintiff's right hip were loose and eventually performed a hip replacement revision surgery on plaintiff on January 12, 2006, over two years after the incident. (Leff Dep. 129:2-130:17, 137:6-10.) Dr. Leff admitted that he did not speak to Dr. Bostrom regarding his diagnosis or review plaintiff's MRI report or any of Dr. Bostrom's other records related to plaintiff's hip surgery or post-operative treatment. (Leff Dep. 137:6-138:1, 203:13-16, 237:23-239:13.) Dr. Leff stated that his understanding of Dr. Bostrom's diagnosis came solely from plaintiff himself. (Leff Dep. 138:2-6.) Furthermore, although Dr. Leff alleged that there were no loose screws in plaintiff's hip prior to the November 2003 incident, he conceded that he did not have an x-ray of plaintiff's hip from before the incident to use in a comparative analysis. (Leff Dep. 233:8-22.)

With respect to plaintiff's right knee pain, Dr. Leff opined that plaintiff's meniscus was likely torn in the course of the November 2003 incident. (Leff Dep. 154:12-14, 235:3-11.) Dr. Leff based his diagnosis on the radiologist's report issued in conjunction with the MRI ordered by Dr. Inglis on February 18, 2004, in which the radiologist noted "mild fraying" of the meniscus. (Leff Dep. 157:6-158:6.) Dr. Leff testified that he interpreted the radiologist's use of the word "fray" to mean "torn" (Leff Dep. 157:13-24), and that he did not speak to either Dr. Inglis or plaintiff about the degree of injury to plaintiff's meniscus (Leff Dep. 158:1-6). Furthermore, Dr. Leff stated that a torn meniscus and a frayed meniscus are the "same thing

basically" and the different terms are "just semantics" and the only difference is "a matter of degree." (Leff Dep. 154:12-21, 156:6-10, 224:10-17.)

Dr. Leff testified that, following plaintiff's meniscectomy on August 31, 2004, Dr. Inglis sent him a follow-up note indicating that plaintiff was doing "absolutely fantastic." (Leff Dep. 158:10-15.) When asked if he was getting contrary information from plaintiff about the pain in his knee post-surgery, Dr. Leff replied, "No. I really wasn't focused on the knee at all." (Leff Dep. 158:18-19.) Dr. Leff noted that plaintiff first returned to his office complaining of knee pain in September 2004 (Leff Dep. 158:20-22, 159:10-17), and then again in October 2006 (Leff Dep. 170:10-171:1). Although concluding in his September 2006 report that the November 2003 arrest was the "direct cause" of plaintiff's "torn" meniscus in his right knee (Leff Report 4), Dr. Leff conceded that he did not have an MRI of plaintiff's knee from before the November 2003 incident to use in any comparative analysis (Leff Dep. 235:12-16).

Dr. Leff also reported that, following the November 2003 incident, plaintiff's medication was increased and/or adjusted as follows: MS Contin, 200 milligrams up to five times a day, Percocet 10/650, up to six tablets a day, Actiq, an opioid agonist,[5] 1600 micrograms up to four times a day, Voltaren, an anti-inflammatory, 75 milligrams up to twice a day, and Quinine, 325 milligrams up to twice a day. (Leff Report 4; Leff Dep. 181:3-194:19.) Dr. Leff testified that, prior to the November 2003 incident, plaintiff consistently reported his pain level on a scale of one to ten, at six. (Leff Dep. 140:11-141:12; Pl.'s Mem. 7-8.) However, the Court notes that Dr.

---

[5] Actiq is a Schedule II opioid used for the "management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain." See Actiq Web Site, http://www.actiq.com/ (last visited September 15, 2008).

Leff's office records from plaintiff's October 9, 2003, appointment, indicate that plaintiff reported his pain level in his back and right hip as a ten out of ten.  (Levine Decl. Ex. M.)

In sum, Dr. Leff's final diagnosis as delineated in his September 2006 report was that plaintiff's "torn" meniscus and "shattered" hip prosthesis were direct results of the "trauma accompanying the arrest of November 3, 2003".  (Leff Report 2, 4; see also supra note 4.)  Dr. Leff arrived at this conclusion based primarily on plaintiff's reports of increased pain, and his consequent need for and tolerance of the increased doses of pain medication.  (Pl.'s Mem. 8; Leff Dep. 194:20-195:17.)

Dr. Leff testified that he had no formal training in orthopedics (Leff Dep. 95:2-4), and that although he was aware that plaintiff had three prior hip surgeries (Leff Dep. 109:9-16), he had not reviewed any medical records related to any of those surgeries (Leff Dep. 110:17-19).  Dr. Leff also stated that plaintiff may have had two arthroscopic procedures on his right knee, prior to the one performed after the November 2003 incident, though he cannot be sure.  (Leff Dep. 170:6-9.)  Finally, Dr. Leff concluded that plaintiff is "currently permanently, totally disabled from any work."  (Leff Report 4.)

### 3.    Dr. Allan E. Inglis

Dr. Allan E. Inglis is an orthopedic surgeon who specializes in total joint replacement, specifically hip and knee replacement.  (A. Inglis Dep. 14:9-17, 15:20-22, Dec. 11, 2006 ("Inglis Dep.").)  Dr. Inglis did his internship in general surgery, his residency in orthopedic surgery, a fellowship in orthopedic biomechanics and custom prosthesis design, and another fellowship in total knee and hip replacement.  (Inglis Dep. 14:22-15:10.)

Plaintiff's initial consultation with Dr. Inglis was on January 16, 2004.  (Decl. of S. Scharfstein Ex. W ("Inglis Records"), Nov. 28, 2007 ("Scharfstein Decl.").)  Dr. Inglis ordered

x-rays of plaintiff's right knee and pelvis and an MRI of plaintiff's right knee.  (Scharfstein Decl. Ex. R, S.)  The x-ray report indicated two possible loose screws in plaintiff's right hip, and noted the following with respect to plaintiff's right hip prosthesis:  "No fracture of the hardware is seen and no obvious evidence of medullary loosening is demonstrated but have no prior films for comparison.  Dystrophic calcifications are noted above the greater trochanter and the bones are demineralized."  (Scharfstein Decl. Ex. S, Jan. 16, 2004.)   The MRI report for plaintiff's right knee indicated the following:  "Mild fraying, medial meniscus posterior horn inferior margin.  Mild blunting, body of medial meniscus most likely from prior arthroscopic surgery." (Scharfstein Decl. Ex. R, Feb. 18, 2004.)

Dr. Inglis's office records from plaintiff's January 16, 2004, initial consultation indicate the following with respect to plaintiff's right knee:  "Examination of the right knee reveals some tenderness along the medial joint line but otherwise normal."  (Inglis Records 2.)  During plaintiff's April 16, 2004, office visit, Dr. Inglis noted that plaintiff's right knee "seems to be bothering him a little bit less than it was."  (Inglis Records 2.)  Dr. Inglis further noted that the MRI of plaintiff's right knee showed "some mild blunting of the body of the medial meniscus [and] a little bit of wear and tear on the posterior horn of the medial meniscus but otherwise looks pretty good."  (Inglis Records 2; Inglis Dep. 46:16-25.)

Dr. Inglis testified that the MRI of plaintiff's knee did not indicate that plaintiff suffered a traumatic injury to his knee, but rather manifested a degenerative condition.  (Inglis Dep. 49:3-7, 50:14-19.)  Dr. Inglis explained that "mild blunting" of the medial meniscus has either been that way "for a long period of time" or is caused by "previous surgery".  (Inglis Dep. 58:6-11.) He stated that there are no other causes for "mild blunting" of the medial meniscus.  (Inglis Dep. 58:10-11.)  Dr. Inglis also noted that meniscal fraying is due to "degenerative wear and tear" and

not trauma. (Inglis Dep. 47:6-9; 67:5-7; 69:8-9.) Dr. Inglis explained that, although trauma can exacerbate the meniscal degenerative process (Inglis Dep. 67:8-9), there was no evidence to suggest that plaintiff's meniscal degeneration in his right knee had been exacerbated (Inglis Dep. 68:2-5).

Dr. Inglis performed an arthroscopic medial meniscectomy on plaintiff's right knee on August 31, 2004. (Inglis Dep. 51:17-22; Inglis Records 3.) Dr. Inglis noted the following with respect to the meniscectomy: "I looked at the whole knee and specifically the medial meniscus was noted to be intact. There was mild fraying of the anterior horn and that this was cleaned up with what we call a shaver. The medial femoral condyle had grade 2 to 3 chondromalacia, which is mild degenerative changes. The medial tibial plateau was healthy. The anterior cruciate ligament was stable. Then we looked in the lateral compartment and there was noted to be some posterior horn fraying and mild degeneration. There was also a chondromalacia at grade 2 to 3 of lateral tibial plateau and healthy lateral femoral condyle . . . [T]he posterior horn of the lateral meniscus was cleaned up using a shaver." (Inglis Dep. 52:6-19.) Dr. Inglis concluded, based on the meniscectomy, that the damage to plaintiff's knee was more likely due to "wear and tear than trauma." (Inglis Dep. 52:20-23.) At plaintiff's September 16, 2004, follow-up visit, Dr. Inglis observed the following with respect to plaintiff's post-operative recovery: "[Mr. Phelps] is doing absolutely fantastic. He has no complaints whatsoever and he is very pleased with his result." (Inglis Records 3.)

Dr. Inglis also relayed that plaintiff informed him, during his initial consultation, that his hip and knee pain began after "he was pushed into a police car." (Inglis Dep. 49:21-25.) Dr. Inglis concluded, however, that plaintiff's hip condition was due to degeneration (Inglis Dep. 65:7-11), and was a "chronic problem. . . [t]hat has nothing to do with trauma" (Inglis Dep. 50:4-

13).  Dr. Inglis stated that his examination of plaintiff's right hip, including x-rays and a bone

scan, showed no traumatic injury to the hip (Inglis Dep. 48:21-49:2, 49:21-50:13), and that

hyperflexion could not cause the screws in plaintiff's hip prosthesis to become loose (Inglis Dep.

66:13-22).

Dr. Inglis's initial consultation records indicate the following with respect to the loose

screw in plaintiff's right hip:  "X-rays taken today . . . [show what appears to be] a free screw.

Upon questioning [plaintiff] says that this was noted a long time ago by Dr. Tullos and he was

told that this was used to fix a bone graft in the area of the acetabulum."  (Inglis Records 2.)  Dr.

Inglis went on to note that the x-rays also revealed "osteolysis of the acetabulum as well as

osteolysis of the proximal medial femur" and that plaintiff had "significant acetabulum

polyethylene wear."  (Inglis Records 2; Inglis Dep. 58:12-23.)  During plaintiff's initial

consultation, Dr. Inglis also observed that plaintiff had pain "exclusively posteriorly in the area

of the sciatic nerve" and noted that plaintiff had informed him that he had consulted Dr. Steven

Stuchin, an orthopedic surgeon, one month before, and that Dr. Stuchin told plaintiff that his

"[hip] socket had moved and that his problem was in his sciatic nerve."  (Inglis Records 1-2.)

Plaintiff subsequently returned to Dr. Inglis's office on April 28, 2005, complaining of

pain is his right groin and buttock.  (Inglis Records 3.)  Dr. Inglis noted that x-rays indicated that

"the revision right total hip replacement [is] in satisfactory position."  (Id.)  Dr. Inglis also noted

the following:  "There is certainly osteolysis [in plaintiff's right hip] but it is difficult to tell

whether this is progressive since his last surgery in 1997[,] but there was wear on his last set of

x-rays in January of 2004 and there is osteolysis now.  Again, I can not comment whether this is

worse."  (Inglis Records 3.)  Dr. Inglis suggested that plaintiff get a general surgical consult to

"rule out a hernia", an ultrasound of the right ischial tuberosity and hamstring area and a bone

scan to evaluate his hip.  (Id.)  On May 26, 2005, Dr. Inglis informed Dr. Leff that, based on the

results of plaintiff's bone scan, he believed that plaintiff's pain was "more likely spinal than

from his hip."  (Inglis Records 4.)  Dr. Inglis went on to note that "[t]here is no question that he

does have some osteolysis due to acetabular polyethylene wear but I do not think this is the

primary source of his discomfort at this time."  (Id.)

### 4.     Dr. Mathias P. Bostrom

Dr. Bostrom is an orthopedic surgeon who specializes in total joint replacement.  (M.

Bostrom Dep. 11:15-17, Jan. 9, 2007 ("Bostrom Dep.").)  Dr. Bostrom did his residency in

orthopedic surgery, a fellowship in metabolic disease, and a fellowship in adult total joint

replacements.  (Bostrom Dep. 12:1-5.)  Dr. Bostrom performs approximately two hundred hip

replacement surgeries in a given year, and has performed 1,000 to 2,000 hip replacement

surgeries in the course of his practice.  (Bostrom Dep. 15:8-10.)

Plaintiff's initial consultation with Dr. Bostrom was on October 28, 2005, and an x-ray of

plaintiff's right hip ordered by Dr. Bostrom on that date revealed a loose screw in the acetabular

compartment (Bostrom Dep. 17:15-18:8), as well as osteolysis "surround[ing] the acetabular

compartment and . . . the proximal femur" (Bostrom Dep. 19:8-20).  Plaintiff's subsequent bone

scan showed loosening of the acetabular compartment of plaintiff's right hip (Bostrom Dep.

21:14-18), and plaintiff's MRI revealed "a significant amount of acetabular osteolysis, or bone

loss around the acetabular compartment" (Bostrom Dep. 22:8-23:12).

Dr. Bostrom testified that the osteolysis which he observed on plaintiff's MRI, a

"mechanical wearing down of the bearing surface, which in this case is a metal ball in a plastic

bearing", occurs over time (Bostrom Dep. 22:21-23:6, 33:7-9), and that a CAT scan of plaintiff's

hip reflected "advanced polyethylene lineal wear" (Bostrom Dep. 39:8-40:5).  Dr. Bostrom also

stated that he did not observe any fractures to plaintiff's right hip. (Bostrom Dep. 23:19-21, 28:17-19.)

On January 12, 2006, Dr. Bostrom performed surgery on plaintiff to revise his right total hip replacement. (Bostrom Dep. 16:19-23, 31:4-6.) During surgery, Dr. Bostrom observed that plaintiff's acetabular compartment was loose and that there was significant bone loss in the pelvis around the acetabular compartment. (Bostrom Dep. 31:7-11.) Dr. Bostrom testified that the bone loss he observed during surgery was due to wearing of the plastic in the hip replacement. (Bostrom Dep. 31:16-19.) Dr. Bostrom stated that he could not be sure what caused the final loosening of the acetabular compartment, and that attempting to determine the cause would involve "pure speculation." (Bostrom Dep. 35:18-20, 57:15-20, 58:20-59:4, 72:8-22.) When asked if a traumatic event could have caused plaintiff's hip condition, Dr. Bostrom responded as follows: "[M]aybe his [hip prosthesis] was . . . holding on by a thread and some sort of traumatic event happened two years prior to him seeing . . . me that loosened it just enough to start causing him the pain. That is possible. Is it possible that it would have loosened without any traumatic event, and the answer is, that is also possible, I don't know." (Bostrom Dep. 58:23-59:4.)

During plaintiff's May 26, 2006, office visit, plaintiff complained of increased knee pain to Dr. Bostrom, who ordered an x-ray of plaintiff's right knee and observed that "the kneecap was tilted a little bit, but otherwise was fairly unremarkable." (Bostrom Dep. 49:22-50:21.) Dr. Bostrom scheduled plaintiff for an MRI of his knee on June 16, 2006, but never heard back from plaintiff. (Bostrom Dep. 52:5-15.)

D.      **Procedural History**

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 on February 25, 2004, against defendant Szubinski, alleging false arrest and excessive force, as well as state law claims for false arrest, battery and negligence, and derivative state law claims against defendant City of New York.  (Complaint ¶¶ 2, 4.)

Presently before the Court is defendants' motion for summary judgment on all claims. Defendants contend that there is no competent medical evidence in the record to support plaintiff's claim that his injuries were either caused or exacerbated by defendant Szubinski's actions.  (See generally, Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., Nov. 28, 2007 ("Defs.' Mem.").)  Defendants argue that summary judgment should be granted on both plaintiff's false arrest claim, as there was probable cause for plaintiff's arrest, and on plaintiff's excessive force claim, as there is no medical evidence of causation of injuries or use of unnecessary force.  (Id. at 8-16.)  Defendants also argue that defendant Szubinski is entitled to qualified immunity from suit, and that this Court should decline to exercise jurisdiction as to all the state law claims.  (Id. at 18-26.)  Plaintiff, in his opposition papers, argues that defendant Szubinski used unreasonable force in effecting his arrest, but does not challenge the existence of probable cause for the arrest.  (Pl.'s Mem. 1.)

## II.  DISCUSSION

A.      **The Summary Judgment Standard**

The standard for granting summary judgment is well established.  Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The burden is upon the moving party to demonstrate that "no genuine issue of material fact exists," Marvel Characters v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted), but "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).

In determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003) (citation omitted). The non-moving party must come forth with "significant probative evidence"

demonstrating that a factual dispute does in fact exist.  <u>Anderson</u>, 477 U.S. at 249 (citation omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Id.</u> at 249-50 (citations omitted).

However, "[t]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."' <u>Id.</u> at 248-49 (<u>quoting</u> <u>First Nat'l Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 288-89 (1968)).  In deciding a motion for summary judgment, the court's function is not to weigh the evidence or resolve issues of fact, but only to determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  <u>Anderson</u>, 477 U.S. at 250; <u>see</u> <u>also</u> <u>Lucente v. IBM</u>, 310 F.3d 243, 254 (2d Cir. 2002).


**B.**     **Federal Causes of Action**

To prevail on his § 1983 claim, plaintiff must show that defendant Szubinski, acting under color of state law, deprived him of a right secured by the Constitution or laws of the United States.  <u>See</u> <u>Palmieri v. Lynch</u>, 392 F.3d 73, 78 (2d Cir. 2004) (citation omitted).  Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."  <u>Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.</u>, 423 F.3d 153, 159 (2d Cir. 2005) (<u>citing</u> <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 816 (1985)).

1. **False Arrest**

Officer Szubinski, who was on patrol in a marked RMP on November 6, 2003, at approximately 6:00 P.M., in the vicinity of Crossbay Boulevard in Queens County, determined that plaintiff was speeding through the use of a radar gun and directed plaintiff to pull over to the side of the road. (Complaint ¶¶ 16-17; <u>see</u> <u>also</u> Pl.'s Mem. 1-2.) Officer Szubinski subsequently determined that plaintiff's driver's license had been revoked and placed him under arrest. (Complaint ¶¶ 22-24.) Plaintiff testified at his deposition that he did not recall the speed at which he was traveling when his vehicle was stopped by defendant Szubinski (Pl.'s Dep. 101:17-19), or the speed limit in the area in which he was stopped (Pl.'s Dep. 106:4-16).

Probable cause to arrest exists where the police officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." <u>United States v. Delossantos</u>, 536 F.3d 155 (2d Cir. 2008) (citations and internal quotation marks omitted). "[P]robable cause to arrest constitutes justification and is a complete defense to an action for false arrest." <u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996) (citations and quotation marks omitted).

Although plaintiff does not challenge probable cause for the arrest in his opposition papers to the instant motion, I find, based on these facts, that there was probable cause for plaintiff's arrest and grant summary judgment on plaintiff's false arrest claim.

2. **Excessive Force**

The Supreme Court requires that all claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen be analyzed under the Fourth Amendment reasonableness standard. <u>Graham v. Connor</u>, 490 U.S.

386, 395 (1989). The Court must consider the "totality of the circumstances faced by the officer on the scene." Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995) (citing Graham v. Connor, 490 U.S. at 396). Thus, the proper inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005) (quoting Graham v. Connor, 490 U.S. at 397). More specifically, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (citation and internal quotation marks omitted). However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." Id. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)) (internal quotation marks omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)). Courts in this Circuit have held that in order "to sustain a claim for excessive force, the Plaintiff must establish through evidence, that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable" and, consequently, that "the amount of force used was more than de minimus [sic]." Rincon v. City of New York, No. 03 Civ. 8276 (LAP), 2005 U.S. Dist. LEXIS 4335, at *11 (S.D.N.Y. Mar. 21, 2005) (citations and quotation marks omitted) (granting summary judgment dismissing excessive force claim where plaintiff treated only for swelling in right leg and wrist despite alleging that force of being thrown to ground caused "stitches on her leg [to] split open"); see also Jennejahn v. Vill. of Avon, No. 06-CV-6054T, 2008 U.S. Dist.

LEXIS 67608, at *16-19 (W.D.N.Y. Aug. 22, 2008) (dismissing excessive force claim on summary judgment despite disputed issue as to amount of force used because officer's actions constituted de minimis use of force and there was no evidence arrestee suffered physical injury); Bradley v. Village of Greenwood Lake, 376 F. Supp. 2d 528, 535 (S.D.N.Y. 2005) (granting summary judgment dismissing excessive force claim against arresting officer who kicked plaintiff in the stomach causing temporary nausea and an abdominal scratch); Esmont v. City of New York, 371 F. Supp. 2d 202, 213-15 (E.D.N.Y. 2005) (Sifton, J.) (dismissing excessive force claim on summary judgment where arresting officer caused plaintiff to bump her head as she was placed in patrol car, resulting in a headache; left her in hot patrol car for ten minutes, resulting in profuse sweating; and applied handcuffs too tightly, resulting in bruising, swelling and unsubstantiated claims of nerve damage); Mandina v. City of Yonkers, 97 Civ. 1087 (LAP), 1998 U.S. Dist. LEXIS 14553, at *24-27 (S.D.N.Y. Sept. 16, 1998) (granting summary judgment against pro se plaintiff who alleged that arresting officers used excessive force by pushing him into police car causing back injury where plaintiff had preexisting back injury and emergency room physician found no evidence of exacerbation or new injury); Roundtree v. City of New York, 778 F. Supp. 614, 622 (E.D.N.Y. 1991) (Glasser, J.) ("[T]o conclude that a 'push' that does not cause the slightest of physical injuries to the plaintiff is nonetheless an actionable use of excessive force would be to hold that any physical contact by an arresting officer with the arrested person is actionable. This would transform the constitutional wrong of excessive force in arrest into the common law tort of battery; and it would reduce the holding in Graham into an empty proposition against which no use of force is reasonable as a matter of law.").

In the instant case, plaintiff alleges that Officer Szubinski pushed plaintiff onto the rear passenger seat of the RMP, causing his right buttock to land on top of the seatbelt receptacle.

(Phelps Aff. ¶ 2.)  Plaintiff also alleges that Officer Szubinski hyperextended plaintiff's right leg while placing it in the RMP, and then slammed the door, causing the inside door handle to strike plaintiff's right leg.  (Phelps Aff. ¶ 2; Pl.'s Mem. 3; Pl.'s Dep. 127:6-23.)  Plaintiff claims, that as a result of this incident, he experienced a great deal of pain and eventually had to undergo a hip replacement revision surgery on his right hip prosthesis and an arthroscopic medial meniscectomy on his right knee.  (Pl.'s Mem. 2-5.)

To defeat a properly supported motion for summary judgment, the non-moving party must come forth with "significant probative evidence" demonstrating that a factual dispute does in fact exist.  Anderson, 477 U.S. at 249 (citation omitted).  Conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.  See Shannon, 332 F.3d at 99.  Neither will a showing of "some metaphysical doubt as to the material facts" benefit the non-moving party.  Matsushita, 475 U.S. at 586.  "[O]nly when it is apparent than no rational finder of fact 'could find in favor of the non-moving party because the evidence to support its case is so slight' should summary judgment be granted."  Rincon v. City of New York, 2005 U.S. Dist. LEXIS 4335, at *8 (quoting Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994)).  Even accepting plaintiff's version of facts as true and construing all evidence in the light most favorable to plaintiff, I find that plaintiff has not submitted any evidence which would permit a reasonable trier of fact to conclude that the force employed by Officer Szubinski in effecting plaintiff's arrest caused plaintiff injury or exacerbated plaintiff's preexisting medical conditions.

Plaintiff's treating pain management physician and expert witness, Dr. Leff, who has no formal training in orthopedics (Leff Dep. 95:2-4) and admitted that he had not reviewed any of plaintiff's relevant medical records from either before or after the November 2003 incident (Leff

Dep. 110:17-19, 137:6-138:1, 138:7-21, 170:6-9, 201:10-11, 203:13-16, 237:17-21, 237:23-239:13), opined that the severity of plaintiff's hip, knee and back problems was exacerbated by and the direct result of the "trauma accompanying the arrest of November 3, 2003" (Leff Report 2, 4). Dr. Leff arrived at this conclusion based primarily on plaintiff's reports of increased pain,[6] and his consequent need for and tolerance of increased doses of pain medication. (Pl.'s Mem. 8; Leff Dep. 194:20-195:17.)

The Court notes, however, that, although the Ambulance Call Report from the evening of the incident may, when viewed in the light most favorable to plaintiff, indicate some swelling to plaintiff's knee (Levine Decl. Ex. O), Peninsula Hospital emergency room staff failed to record any swelling or bruising to plaintiff's right leg (Id.), which is inconsistent with the level of injury described by plaintiff.[7] Furthermore, Dr. Inglis, the orthopedic surgeon who performed plaintiff's meniscectomy, concluded that the damage to plaintiff's knee necessitating surgery, a mild fraying and blunting of the medial meniscus, was due to plaintiff's previous arthroscopic surgery and to "degenerative wear and tear" and not trauma. (Inglis Dep. 47:6-9, 52:20-23, 58:6-11, 68:2-5, 69:8-9; see supra pp. 10-14.) When plaintiff returned to Dr. Inglis months after his knee surgery, complaining of pain in his right groin and buttock, Dr. Inglis opined, based on the results of plaintiff's bone scan, that his pain was "more likely spinal than from his hip." (Inglis Records 3-4.)

---

[6] However, as the Court noted supra, Dr. Leff's office records from plaintiff's visits immediately preceding the November 2003 incident indicate that plaintiff was already reporting his pain level in his back and right hip as a ten out of ten and complaining of knee pain. (Levine Decl. Ex. M.)

[7] Plaintiff described his right knee as "huge, blown up a good size" after the November 6, 2003, incident. (Phelps Dep. 151:23-152:8; see also Pl.'s 50-h Hr'g 27:16-28:14, 29:12-14, 29:24-30:4.)

Finally, Dr. Bostrom, the orthopedic surgeon who performed plaintiff's hip replacement revision surgery, testified that plaintiff's existing hip prosthesis exhibited "advanced polyethylene lineal wear" (Bostrom Dep. 39:8-40:5), a condition which occurs over time (Bostrom Dep. 22:21-23:6, 33:7-9). Dr. Bostrom observed, during plaintiff's hip surgery, that plaintiff's acetabular compartment was loose and there was significant bone loss in the pelvis around the acetabular compartment. (Bostrom Dep. 31:7-11.) However, Dr. Bostrom made clear during his deposition that attempting to ascertain the cause of the final loosening of the acetabular compartment, whether degeneration or trauma, would involve "pure speculation." (Bostrom Dep. 35:18-20, 57:15-20, 58:20-59:4, 72:8-22; see supra pp. 14-15.)

In sum, if the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587 (citation and quotation marks omitted). In the instant case, even drawing all inferences in favor of plaintiff, no jury could conclude, based on the extensive evidence presented, that the force employed by Officer Szubinski in effecting plaintiff's arrest caused or contributed to plaintiff's injuries. Although a showing of excessive force does not require proof of permanent or severe injury, see Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004), plaintiff suffered no demonstrable physical injury as a result of Officer Szubinski's actions. This Court will not deny summary judgment based on mere speculation or conclusory allegations. Accordingly, summary judgment on plaintiff's excessive force claim is granted.

C.      **State Law Causes of Action**

Plaintiff's remaining claims are state law claims for false arrest, battery and negligence against defendant Szubinski, and derivative state law claims against defendant City of New

York. The general rule is that, when federal claims are dismissed prior to trial, the state claims should also be dismissed. Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998); see also Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims") (quoting Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n.7 (1988)); Livant v. Clifton, No. 06-4707-CV, 2008 U.S. App. LEXIS 7377, at *9 (2d Cir. Apr. 7, 2008) ("based on its dismissal of the federal claims, the district court did not abuse its discretion in refusing to exercise jurisdiction over [plaintiff's] remaining state law claims").

Accordingly, I decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims.


## III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted as to plaintiff's false arrest and excessive force claims. I decline to exercise jurisdiction over plaintiff's remaining state law claims. The Clerk of the Court is directed to enter judgment dismissing the complaint. SO ORDERED.


Dated: September 23, 2008
       Brooklyn, New York


_____/ s /_____
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE

25